* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stephenson. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stephenson with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and that the Industrial Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder and nonjoinder of parties.
3. The parties were subject to the Workers' Compensation Act at the time of the alleged injury and/or occupational disease and an employer/employee relationship existed between them. The above designated carrier was on the risk at the time of the injury.
4. On or about February 28, 2002, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment.
5. The employee's average weekly wage at the time of the injury by accident was $440.00 per week, yielding a compensation rate of $293.34.
6. The parties stipulated into evidence a packet of medical records labeled stipulated Exhibit 1.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. This case arises from an accepted claim for a right upper extremity injury, which plaintiff sustained on or about February 28, 2002. Plaintiff was employed as a lineman for Mastec at the time of his compensable injury, and his primary job duties included laying underground cable.
2. On February 28, 2002, plaintiff sustained a traction injury to his right shoulder when a back hoe pulled the primary cable he was holding. The primary cable was attached on one end to a back hoe that was dragging the cable along the ground. Plaintiff was sitting on the ground, holding the other end of the cable with both hands, when the back hoe began moving, yanking the cable and lifting him off the ground, and causing his shoulder injury.
3. Plaintiff suffered a re-injury to his shoulder and elbow in November 2002, when he suffered a subsequent fall at church. This injury resulted in additional injuries that continue to affect the plaintiff's condition.
4. Billy Edmondson was plaintiff's supervisor with Mastec. Mr. Edmondson testified that at the time of plaintiff's injury on February 28, 2002, plaintiff only reported a shoulder injury to the supervisors. In fact, Mr. Edmondson testified that plaintiff was able to continue working the remainder of the day that he was injured, and did not report his work injury until the following Monday.
5. Plaintiff initially presented to Betsy Johnson Regional Hospital, following the injury. Plaintiff's subjective history in those medical records indicates complaints of pain solely related to the right shoulder. None of the medical records from Betsy Johnson cite plaintiff's alleged complaints of pain and numbness throughout his entire right upper extremity, or the alleged numbness in plaintiff's hand and/or fingers. Plaintiff was diagnosed with a right shoulder injury, and the treating physician recommended use of prescription medication and referred plaintiff to Dr. Brown for orthopedic evaluation.
6. Plaintiff was subsequently referred to Brown Orthopedic Surgery 
Sports Medicine Center on March 8, 2002. A review of plaintiff's x-rays revealed hypertrophic changes at the acromioclavicular joint, in addition to sclerosis of the shoulder. Dr. Brown diagnosed plaintiff with right shoulder glenohumeral subluxation, right shoulder labral tear, possible right rotator cuff tear, rotator cuff tendinitis, and shoulder pain. Further, Dr. Brown recommended continuation of plaintiff's conservative treatment program, as well as an MRI of the shoulder to evaluate possible labral and rotator cuff tears.
7. The MRI of the right shoulder was performed on March 16, 2002 and revealed supraspinatus tendinopathy, with possible small incomplete tear along the bursal surface of the tendon. Therefore, at plaintiff's follow-up visit on March 18, 2002, Dr. Brown recommended plaintiff undergo physical therapy, and administered a cortisone injection into the AC joint.
8. Plaintiff returned for follow-up on April 3, 2002, with complaints of severe shoulder pain. Plaintiff specifically denied any neck pain at that time. Dr. Brown recommended EMG/nerve conduction studies of the right upper extremity, as well as an MRI of the cervical spine to rule out a herniated disk. In addition, he continued plaintiff's conservative treatment modalities.
9. Plaintiff was subsequently referred to Adult Neurology Neuro Rehab Services on April 4, 2002 where he underwent a series of nerve conduction studies on the right upper extremity. The results revealed some right ulnar sensory mononeuropathy, with no evidence of polyneuropathy, entrapment neuropathy, or radiculopathy.
10. Plaintiff's cervical spine MRI was negative for any evidence of pathology, although the EMG/nerve conduction studies revealed a right ulnar nerve sensory mononeuropathy (at the elbow), with no evidence of radiculopathy. Therefore, Dr. Brown recommended plaintiff undergo a 3-phase bone scan of the upper extremity to rule out possible reflex sympathetic dystrophy, and kept plaintiff out of work pending further evaluation.
11. Plaintiff ultimately underwent shoulder arthroscopy, acromioplasty, AC decompression, and rotator cuff repair. Following his surgery, plaintiff underwent post-operative treatment with Dr. Brown. Dr. Brown also discussed cubital tunnel release and ulnar nerve transposition when the plaintiff's shoulder had fully recovered.
12. Based on plaintiff's slow recovery post-operatively, and continued complaints of right shoulder pain and stiffness, Dr. Brown performed a closed manipulation and injection of plaintiff's shoulder under general anesthesia on August 22, 2002, after which plaintiff continued his rehabilitation program.
13. On September 11, 2002, plaintiff's complaints centered on the right elbow, with complaints of pain, radiating to the little finger and ring finger of his right hand. Dr. Brown noted plaintiff was making progress in regards to his right shoulder. Dr. Brown noted that plaintiff's Tinel's test was negative over the wrist and Guyon's canal. Accordingly, Dr. Brown recommended plaintiff undergo elbow cubital tunnel release and ulnar nerve transposition.
14. Plaintiff returned for pre-operative follow-up with Dr. Brown on September 25, 2002. Plaintiff reported continued numbness at the elbow, radiating into the ulnar portion of his hand, specifically the ring and little fingers. Repeat Tinel's tests performed over the carpal tunnel were negative.
15. Plaintiff's final pre-operative visit was conducted on October 1, 2002. Dr. Brown noted positive Tinel's across the elbow at the cubital tunnel, but negative Tinel's across the wrist, and negative Phalen's across the wrist. Therefore, on three consecutive visits prior to plaintiff's cubital tunnel release, all provocative tests performed for evaluation of any nerve dysfunction at the wrist were repeatedly negative.
16. Plaintiff ultimately underwent cubital tunnel release and elbow ulnar nerve transposition surgeries on October 3, 2002. Following the surgery, plaintiff again underwent post-operative treatment and evaluation with Dr. Brown, including an aggressive course of physical therapy.
17. On November 18, 2002, plaintiff reported complaints of increased pain and numbness in all of his digits and pain in his elbow and shoulder, following a subsequent accident at church. Plaintiff reported that he fell while exiting church, stuck out his right arm, and injured his shoulder, elbow and hand in the process. Physical examination revealed that he had significant pain in the elbow with any range of motion, and decreased grip strength. Sensation was decreased over the digits of the right hand and he now had positive Tinel's signs over the carpal tunnel for the first time. Dr. Brown referred plaintiff for an MRI of the elbow to evaluate any possible acute fracture.
18. The MRI of the right elbow was performed on December 11, 2002 and revealed high-grade medial epicondylitis with evidence of intrasubstance tearing of the common flexor tendon, mild bony spurring of the medial epicondyle, which Dr. Brown opined was aggravating the ulnar nerve at the elbow, and was brought about his fall at church. In addition, Dr. Brown's December 13, 2002 record indicates plaintiff ruptured the muscle belly in his elbow due to his most recent fall.
19. On February 21, 2003, Dr. Brown noted that plaintiff's shoulder and elbow appeared to be fairly well healed, although there was still some stiffness with range of motion. However, he noted that plaintiff was now exhibiting symptoms of carpal tunnel syndrome. Dr. Brown's notes at this point indicate plaintiff's compensable shoulder and elbow injuries had nearly healed, and that the alleged carpal tunnel syndrome was the only factor hindering plaintiff's return to work.
20. Dr. Brown's May 2, 2003 note refers to plaintiff's symptoms of carpal tunnel syndrome and notes that "due to his rehabilitation, his shoulder surgery, neurologic problems after that and including the cubital tunnel syndrome, that this brought about his symptoms of carpal tunnel. He did not have those at work, but developed those going through the therapy process."
21. By June 4, 2003, Dr. Brown noted plaintiff's physical examination revealed decreased complaints of pain in plaintiff's shoulder and elbow injuries. Plaintiff exhibited full range of motion in his shoulder, as well as full range of motion in the elbow. At this point Dr. Brown's treatment appeared to be centered on plaintiff's wrist and alleged carpal tunnel. Therefore, plaintiff had reached maximum medical improvement in regards to his compensable shoulder and elbow injuries, as of June 4, 2003.
22. Plaintiff has continued to receive ongoing treatment and evaluation with Dr. Brown through the date of the hearing before the deputy commissioner. Despite plaintiff's normal diagnostic studies, Dr. Brown continues to recommend surgical release of the right carpal tunnel and Guyon's canal. All of plaintiff's treatment with Brown Orthopedic has centered on his complaints at the wrist since March 2003. Therefore, plaintiff's continued disability is solely related to his alleged carpal tunnel syndrome.
23. Plaintiff's records were subsequently referred to Dr. Edwards at Raleigh Hand Center for further evaluation. In his October 8, 2003 correspondence, Dr. Edwards reported that "the actual figures [from plaintiff's EMG/NCV studies] appear to be within normal limits and I am not sure why they had the impression of CTS." Moreover, Dr. Edwards indicated "I do not find any indication that his work injury or surgery and therapy related to the work injury caused or significantly aggravated his carpal tunnel."
24. Accordingly, defendants referred plaintiff to Raleigh Hand Center for an independent medical examination with Dr. Edwards on March 17, 2004. Following physical examination, Dr. Edwards noted plaintiff had "minimal symptoms suggestive of CTS at this time." Dr. Edwards diagnosed plaintiff with right shoulder injury and cubital tunnel syndrome status post two operations and opined that he "did not see any evidence of CTS at this time, and therefore, I think it is a moot point to question whether CTS came from the surgery or requires surgery as there is no evidence of CTS at this time."
25. The parties took the medical deposition of Dr. Brown on March 26, 2004. He stated that although plaintiff had numbness into his ring and little fingers initially, these symptoms could be indicative of numerous injuries, and he therefore concentrated on plaintiff's shoulder complaints which were the most significant.
26. On cross-examination, Dr. Brown admitted that although he is trained to read the results of the EMG/NCV tests, he simply accepted the conclusions of the interpreting physician, rather than reviewing the actual numbers obtained. This fact is significant since Dr. Edwards testified that he reviewed all of the actual numbers obtained in the EMG tests of April 2002 through June 2003 and those numbers were within normal limits.
27. Dr. Brown testified that throughout the course of plaintiff's treatment, the only reports of numbness in plaintiff's hand related to the ring and little fingers. According to Dr. Brown, while this can be consistent with carpal tunnel syndrome, generally you see pain and numbness radiating down the median side of the wrists and hands in carpal tunnel cases.
28. Dr. Brown also addressed the negative provocative tests performed at the wrist and Guyon's canal on September 11, 2002, September 25, 2002, and October 1, 2002. He stated that negative results for these tests are suggestive that there was no injury affecting the wrist. Since both tests were repeatedly negative, Dr. Brown admitted the results suggested there was no carpal tunnel at that time.
29. Following plaintiff's November 18, 2002 injury at church, Dr. Brown stated plaintiff began to complain of numbness in all of the digits of the hand. Plaintiff also complained of increased pain in his shoulder and elbow. Therefore, Dr. Brown admitted the fall certainly aggravated these injuries. More importantly, Dr. Brown noted that plaintiff's Tinel's sign was positive over the carpal tunnel following his injury at church. Dr. Brown admitted that these results would suggest that the injury at church aggravated the nerve or compressed the nerve at the carpal tunnel.
30. Dr. Brown also testified that he was unsure whether carpal tunnel release surgery would provide any benefit to plaintiff's condition. Specifically, he indicated that "he's [Plaintiff] got problems, neurologic problems, with the upper extremity caused by his injury at work, and if there was something else that could be done, then I would recommend that." Dr. Brown indicated he was actually not "pushing for surgery," but was pushing for "more information."
31. The parties took the medical deposition of Dr. Edwards on April 15, 2004. In his deposition, Dr. Edwards testified on direct examination that he was certified not only in orthopedics, but also specialized in hand surgery.
32. Dr. Edwards noted that plaintiff's symptoms of pain and numbness radiating from his shoulder, elbow and into the little finger and half of the ring finger were causally related to the cubital tunnel syndrome. In comparison, he noted that carpal tunnel syndrome is generally characterized primarily by numbness in the thumb, index, middle and half of the ring finger.
33. Dr. Edwards testified that while traumatic injuries can cause or aggravate carpal tunnel syndrome, the type of traumatic injuries generally required are of a highly traumatic nature, such as a wrist dislocation or displaced radius fractures. Dr. Edwards testified that he saw no evidence of the type of injury necessary to cause traumatic carpal tunnel syndrome in this case.
34. Further, Dr. Edwards indicated that there was no evidence of symptoms of carpal tunnel syndrome about the time of plaintiff's work-related shoulder injury. He testified he would predominantly look for numbness in the thumb, index and middle fingers initially, and possibly some weakness of the grip. However, he found no evidence of these symptoms throughout the course of plaintiff's treatment.
35. Dr. Edwards also noted that he reviewed the EMG/nerve conduction studies performed in this case. As opposed to Dr. Brown's review of the interpreting physician's conclusions, Dr. Edwards actually reviewed the numbers and objective results for these tests. He testified that the results of these tests did not reveal any evidence of carpal tunnel syndrome, and were within normal limits for the median nerve function.
36. Dr. Edwards testified that he followed up his review of the records with the independent medical examination, specifically looking for possible evidence of carpal tunnel syndrome. However, after thorough examination of plaintiff he testified that plaintiff did not have carpal tunnel syndrome, and that his current symptoms were likely related to his previous shoulder and/or elbow injuries.
37. Dr. Edwards also discussed the possible relationship between some of plaintiff's current symptoms and cervical radiculopathy. If plaintiff did have cervical radiculopathy, Dr. Edwards stated he would expect to see evidence of severe neck pain immediately following an injury, or soon thereafter. Otherwise, any radiculopathy would likely not be related to a traumatic injury. In this case, Dr. Edwards noted that plaintiff specifically denied complaints of neck pain on April 3, 2002, less than a month after his accident at work. In addition, his cervical MRI performed in April 2002, revealed no evidence of cervical radiculopathy. Accordingly, Dr. Edwards testified that these findings would suggest that there was "not a correlation between his neck problem and the injury."
38. He also noted that the November 18, 2002 injury was likely more injurious to the carpal tunnel than the original work injury, although he doubted that the fall caused carpal tunnel syndrome.
39. Dr. Edwards testified that the positive Tinel's and Phalen's tests following the subsequent injury could be explained by the fact that plaintiff's wrist area was swollen or irritated enough from the fall that some bruising and swelling may have irritated the median nerve. He also indicated that positive Tinel's and Phalen's tests could result from incorrect testing technique by the physician.
40. Dr. Edwards testified that plaintiff's physical findings from March 17, 2004, including persistent numbness in the ring and little fingers of the right hand, were not at all suggestive of carpal tunnel syndrome. Specifically, he noted that plaintiff had normal sensation of the thumb, index, and middle fingers. As such, plaintiff did not exhibit any symptoms indicative of carpal tunnel syndrome, but rather his problems appear to be related to his elbow condition. He also noted that plaintiff could be experiencing some difficulties with cervical radiculopathy, which as noted above, he opined was not related to the work injury.
41. According to Dr. Edwards, plaintiff exhibited significant symptom magnification and/or submaximal effort in his physical evaluation, which suggested a psychological component to plaintiff's problems.
42. Therefore, he recommended that plaintiff not be treated for carpal tunnel syndrome, and specifically recommended against performing carpal tunnel release surgery. Such surgery would have negative effects on plaintiff's condition, and would likely result in unnecessary pain, and continued disability.
43. Dr. Edwards recommended possible future treatment including an MRI of the cervical spine to rule out current cervical radiculopathy. However, he noted that these problems are not related to the work injury.
44. Dr. Edwards opined that plaintiff has reached maximum medical improvement and recommended assigning a permanent partial disability rating of anywhere from 12% to 25%. In order to provide a definite rating, Dr. Edwards indicated he would need to reevaluate the plaintiff with specific reference to the elbow.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Although plaintiff suffered a compensable right shoulder injury on February 28, 2002, his current alleged condition of right carpal tunnel syndrome is not causally related to the compensable injury. As such, plaintiff is not entitled to the surgery recommended by Dr. Brown. N.C. Gen. Stat. § 97-2; Bryan v. First Free Will Baptist Church, 267 N.C. 111,147 S.E.2d 633 (1966); Lewter v. Abercrombie Enters, Inc., 240 N.C. 399,82 S.E.2d 410 (1954).
2. Additionally, plaintiff has reached maximum medical improvement in regards to his accepted right shoulder and/or elbow injuries and any alleged continuing disability is the result of a condition unrelated to the compensable injury of February 28, 2004. Accordingly, plaintiff does not suffer from any legally cognizable disability. N.C. Gen. Stat. §97-2(9).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. The plaintiff's claim for workers compensation benefits must be and is hereby DENIED.
2. Defendants shall authorize and pay for a medical examination to determine what permanent partial disability, if any, plaintiff retains from the injury by accident.
3. Each side shall pay its own costs.
This the 5th day of October, 2005.
 S/_________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_________________ THOMAS J. BOLCH COMMISSIONER
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER